On or about April 27, 1945, Willie Morgan, a colored man of the age of approximately 36 years, was employed by the American Bitumuls Company, as a common laborer, and while in the course and scope of his employment sustained an accident and injuries as a result of which he filed this suit on June 22, 1945, against the said employer and its insurer, for benefits under the Workmen's Compensation Law. The original petition sets forth that the accident involved occurred on April 20, 1945, but the defendant set forth that the proper date was April 27th, and said date was thereafter admitted by the plaintiff to be correct, and there is no contest as to this point. The accident is admitted to have occurred while plaintiff was unscrewing a cap on a pipe which enters the bottom of a tank car, with a Stilson wrench, for the purpose of attaching thereto a pipe with which to unload the tank car. The wrench slipped, and as a result he fell and his left shoulder struck a valve or drain pipe (drain barrel), as stated by plaintiff, which resulted in his alleged injuries. The original petition alleges that the injuries resulted in a sub-deltoid Bursitis and Myositis of the left shoulder and prays for compensation for temporary total disability, reserving the right to plead for permanent total disability if developments in his condition should warrant it. By supplemental petition filed February 11, 1947, plaintiff asked for total permanent disability compensation on the ground that his injuries were more serious than at first realized at the time the original petition was filed. It is admitted by the pleadings that an accident as alleged was sustained, and that the said accident was duly reported to petitioner's foreman.
The defendants, however, deny that as a result of the accident the plaintiff sustained any disabling injury and therefore deny that they are indebted to the plaintiff in any sum whatsoever under the terms of the Workmen's Compensation Act, as amended.
In addition to the main issue there is some dispute as to the wage scale of Willie Morgan. It is admitted that he was hired at a rate of pay of 55 cents per hour for 8 hours per day, 5 days per week, plus time and a half for overtime, and double time for Sundays. The testimony also shows that at the time of the employment of plaintiff, he was employed for some 3 weeks, the defendant Company was engaged in war production, and was working its employees 7 days per week, a minimum of 56 hours per week. It appears that plaintiff was working as much as 10 or 11 hours per day on some days. In any event, it seems reasonable to conclude that his contract of employment called for a minimum of 56 hours per week for which he *Page 141 
was paid 55¢ per hour for 40 hours, making $22 and 16 hours at the rate of 82.5 cents per hour, making $13.20, a total of $35.20 per week for his wage. On these facts, the trial judge concluded correctly that in the event he was totally and permanently disabled, as alleged, the compensation rate should be at the maximum under the law at that time, of $20 per week.
After the trial of the case, the trial judge came to the conclusion, for written reasons assigned, that plaintiff had sustained a compensable disability of 20% and that therefore he should recover compensation at the rate of 20% of the maximum of $20 per week, that is, $4 per week for not more than 300 weeks, and accordingly granted judgment to plaintiff in that sum, plus legal interest on past due installments, plus an award for medical assistance heretofore given plaintiff, and costs. Both defendants and plaintiff have appealed. Defendants contend, as they did in the lower court, that plaintiff has suffered no compensable disability and his case should be dismissed. Plaintiff contends that he has sustained a disability of a total and permanent character and that the award should be for total and permanent disability, to wit, $20 per week for 400 weeks. Plaintiff further contends that the lower court erred in not allowing an expert fee of $25 to Dr. Coyt Moore, the Osteopath who treated plaintiff and who testified at the trial, and an expert fee in the sum of $25 to the photographer who made pictures of plaintiff's shoulder and testified with reference thereto.
The main questions involved on appeal are whether or not it has been established that the plaintiff sustained an accident which resulted in an injury which is compensable under our Workmen's Compensation laws, and if so, what rate of compensation should be awarded him.
The plaintiff testified that at about 4:30 in the evening he was pulling upon a wrench unscrewing a cap of a pipe that entered the bottom of a tank car by means of which the car was loaded and unloaded and that when the wrench slipped he fell back against what he calls a drain barrel, and struck his shoulder. This accident is supposed to have occurred, according to plaintiff's petition, on April 20, 1945, at 4:30 p.m., but defendant set forth that it occurred on April 27, 1945, at 10:00 a.m., and it is admitted by plaintiff that the correct date is April 27th. There is no admission or proof as to the time of the accident. In any event, it is shown that plaintiff worked the remainder of the day on which he was injured, which was a Friday, and reported back for work the next day, Saturday, and he quit early and did not work the following Sunday, but returned on Monday, Tuesday, Wednesday, and Thursday; and on May 3rd he was sent to the Company doctor, Dr. Godfrey, for attention.
The date of his examination by Dr. Godfrey is not established, but the record contains the report from Dr. Godfrey dated May 19, 1945, in which he states that he was unable to find anything objectively wrong with plaintiff aside from a possible mild contusion and that X-Rays showed nothing; that "His actions lead me to believe he is malingering, or at least exaggerating his complaint".
Plaintiff's version of the accident is corroborated by fellow employees, and there seems to be no question that it did occur. The serious question is the result of the accident.
After being examined by Dr. Godfrey it appears that he placed himself under the care of Dr. Coyt Moore, an osteopathic surgeon. Dr. Moore testifies that he examined Willie Morgan on May 11, 1945, and that he treated him 62 times thereafter. He states that at the time of his original examination, "There was swelling of the muscles, some thickening of the bones and ligaments of the left shoulder, and I diagnosed injury or inflammation of the nerves of that area at the time of my examination. There is some thickening and apparent soreness of the left shoulder and nearby structures, with a small amount of thickening of the long structures of this left shoulder". He sums up plaintiff's condition as "a combination of arthritis, injury of the ligaments, and straining of the nerves". He states that his treatment consisted of manipulation of the muscles and other soft tissues and the use of infra light. His conclusion is that plaintiff will *Page 142 
never be able to do heavy manual labor for a living. He states that plaintiff has a limitation of 10% on the upper motion of his left arm.
Dr. O. F. Cosby, an Eye, Ear, Nose and Throat specialist, testified on behalf of plaintiff with reference to the Robertson Sign, and quoted extensively from the text book of Ophthalmology by Duke-Elder on this proposition, and together with Dr. J. A. Thom, conducted an examination before the Court, of the plaintiff. Dr. Thom applied pressure on plaintiff's left shoulder and according to Dr. Cosby, upon doing so, plaintiff's eyes dilated almost coincidentally with the application of the pressure. The application of pressure on the right shoulder did not cause this reaction. It seems to be the opinion of medical science that the application of pressure on a painful area will cause a dilation of the eyes; but the same reaction is caused by tickling or by any other stimulus, and for that reason this test, known as "Robertson's Sign" has little, if any probative value, and has not been accepted by the courts.
Francis Julius, a photographer, was called to identify pictures of the plaintiff, which he had taken. These pictures show that plaintiff's left shoulder, at about the middle area posteriorly, had a slight bump, and that his left arm and hand are slightly swollen, and also, that according to the pictures, he is unable to lift his left arm above his head.
Dr. Thom testified that he first saw plaintiff on January 15, 1946, and that plaintiff gave him a history of having bumped his shoulder in April, 1945, against an iron valve and drain cock, and that he complained of pain in the middle portion of his left shoulder posteriorly; that based on the history of the case and the history of the treatment which he reported he had received, he made a diagnosis of brachial plexus neuralgia. He states that on several occasions he measured his arm, and that on two of these occasions he found the arm enlarged particularly from the elbow down to the wrist. He adds that from later observation he made a diagnosis of "Bursitis of the supraspinatus Bursa". He states that the plaintiff's condition disables him to some extent, and that if he tries to work, the condition flares up again; that any kind of hard work with that arm may cause it to flare up, although he may work with it at any time. His opinion is to the effect that there are enough objective findings to convince him that the man has some pathology there, and that he thinks the condition is of indefinite duration.
Mr. J. W. Sicard testified that for several months prior to this accident plaintiff had worked for him as a presser in his cleaning and pressing establishment, and he explained the nature of a presser's duties and, in effect, that to do this work one must have the use of both arms. It may be noted here that plaintiff, prior to assuming his job as common laborer with the defendant company herein, had for several years engaged in the cleaning and pressing business, and that subsequently to his injury, just a few weeks thereafter, he pressed clothes and blocked hats at his house, and derived some earnings therefrom, admitting that some weeks he made as much as $25.
Other medical evidence in behalf of plaintiff consisted of X-Rays which were reported negative, and a report of Charity Hospital of Louisiana at New Orleans, to which plaintiff went for treatment. This report shows that plaintiff was examined by Dr. Guy E. Caldwell and Dr. Baz, and that they made a tentative diagnosis of arthritis in his left shoulder and arm; that he was given a stellate nerve block on October 26, 1945, and told to report back in a week; that on November 2, 1945, he was again given a nerve block in his shoulder and told to report back in 2 weeks, at which time he was discharged.
The testimony of Dr. H. Reichard Kahle and Dr. Frank Brostrom was taken by deposition before a notary public in the Parish of Orleans after due notice to plaintiff. However, neither plaintiff nor his attorney was present at the time their depositions were taken because plaintiff or his attorney refused to be present although the defendants offered to pay his or their expenses to be present, and the only questions addressed to them were by the attorney for the defendant. Dr. Kahle, a surgeon, testified that "His history was one of pain in the left shoulder. My examination *Page 143 
showed no atrophy, and I could find no external evidence of injury; that all his movements were normal in range and did not apparently appear to be painful — that is, of the left shoulder. I found no evidence of nerve injury or of injury to the large vessels supplying the left arm. My conclusion was that I could find no organic cause for symptoms of which he complained." His conclusion is that he could find no disabling injury except as based on subjective symptoms.
Dr. Brostrom, from his examination, states: "I was unable to see any atrophy of the left shoulder * * *. The shoulders were held at equal level. The range of motion, both actively and passively, was normal in the shoulder, elbow, wrist and hand. There were no areas of tenderness on palpation." His opinion is that plaintiff was in no way disabled.
The examination by Dr. Kahle was on October 31, 1946, and by Dr. Brostrom on November 5, 1946. It may be noted that both of these doctors testified that the left arm was slightly larger than the right, and that they were both under the impression that he was left-handed. But it is clearly shown by the evidence that he is right-handed.
The Court, not being fully satisfied with the medical testimony, appointed Dr. T. Jeff McHugh and Dr. J. Ashton Robbins to examine the plaintiff and report to him. Both of these doctors accordingly examined the plaintiff and made reports of their examinations to the trial judge.
Dr. McHugh, in his report, states that the plaintiff gave a history of having fallen and striking the back of his left shoulder on a drain valve, in May of 1945; that he experienced pain in the shoulder for a few minutes, after which it passed off, and he continued to work for the balance of the day, which was about 2 hours; that on arriving home, the shoulder began to swell and pain; that he returned to work the next morning (Saturday) and worked the entire day; that he was supposed to work Sunday, but was unable to do so; that on Monday he was better and he did his regular work Monday and Tuesday; that on Wednesday he returned to the job, but was having pain and was given lighter work; that on Thursday he was sent to Dr. Godfrey, and did not work thereafter. Dr. McHugh states that his complaint at the time of the examination in March, 1937, was "Pain in my left shoulder and swelling that goes down into my arm into my hand." He states that his examination showed the following:
"Well nournished and developed colored male giving his age as 36 years.
Head and neck negative.
Back is regular and negative.
Shoulders are well developed and symmetrical.
He complains of pain from the left neck downward over the left shoulder and down the arm and forearm into the hand.
Both arms appear equally well developed and appear the same size.
The left hand and fingers appear slightly swollen.
He complains of a trigger point of tenderness over the posterior point of the shoulder. At this location he has a small ill-defined lump which is said to come and go.
He adducts both arms to one hundred eighty degrees but complains of the left shoulder in so doing.
He adducts both arms and rotates both shoulders.
On reaching up behind his back the finger tips of the left hand reach the lower border of the shoulder blade.
On reaching up behind his back with the right hand the tip of the fingers reach within three inches of the upper border of the right shoulder blade.
He has a full normal range of motion in the elbows, wrists, hands and fingers.
No atrophy of the muscles of the shoulders, arms or hands could be found.
Blood pressure right arm 125/80 and of the left arm 120/80. I viewed the X-rays which he brought. One set was made by Dr. Lester Williams and one set by Tourc *Page 144 
Infirmary of New Orleans. I am unable to see any fracture, dislocation or bone pathology, in the films of the left shoulder."
He finds that the only objective evidence of abnormality is a small lump in the left upper back and a slight swelling of the left hand, and that the swelling of the left hand, which he states comes and goes, suggests some disturbance in the venous return blood supply of the arm and yet it is difficult to connect this with trauma over the back of the shoulder; that the discrepancy in the blood pressure on the two sides is not an unusual finding; that he could produce some slight swelling of the hand voluntarily by allowing the arm to hang without movement for a long period or by making the pressure over the axillary space. He adds that the disturbance in the venous return blood supply may be caused by a cervical rib, which is a congenital condition, and that the cervical rib condition would be established or ruled out by X-Rays of the neck. It does not appear that any such X-Rays were made and that therefore the cervical rib proposition, as well as the other condition which could be caused voluntarily by the plaintiff, to wit, by the exertion of pressure on his arm, shutting off the blood supply for a period of time, commonly known as "Saturday Night Shoulder", are both in the possibility stage and neither is established by any evidence. In conclusion he estimates that plaintiff has a disability of 15 or 20 per cent., but states "it is difficult for me to reconcile his complaints and findings with the alleged injury which he describes."
It is noted that Dr. McHugh, however, does not connect the disability with any other cause, except the possible causes stated herein.
Dr. Robbins in his report of his examination of plaintiff testifies as follows: "General examination is essentially negative except for slightly enlarged tonsils. Examination of the left shoulder and left arm reveals a slight swelling in the mid-portion of the shoulder, posteriorly. The swelling is slightly indurated (hard and firm), and the skin over it has a slightly shiny appearance, it does not pulsate and no murmur is heard over it. The mass disappears on raising arms above head, becomes more prominent on extending arms to the front and practically disappears on resting arms on table at shoulder level. It is not especially tender. There is no demonstrable muscular atrophy of the left upper extremity. The left hand shows a slight swelling (or edema) and the skin has a shiny appearance. The grip seems weaker in the left hand (The patient claims it causes pain to grip hard.) All motions are normal and all reflexes are normal. There is no apparent loss of sensation." He adds, however, that plaintiff seems to have interference with the returning of blood in the left extremity which causes the swelling of the left hand; that the swelling in the shoulder could have been caused by a blow; that it is hard to connect the location of this slight swelling with any disturbance of the left arm or its circulation. He states that no diagnosis had been made, and that several possibilities suggest themselves, such as a cervical rib, a scalenius Anticus syndrone (Spasm of the scalene muscles) or injury to veins of upper extremity, or even disturbance to the nerve supply of the blood vessels of the left arm. Dr. Robbins states that trauma could play a part in these conditions, except that of a cervical rib. In his testimony he admits that plaintiff could cause a condition of "Saturday Night Shoulder" voluntarily, but, as stated before, this is merely a possibility unsupported by any evidence. Dr. Robbins' conclusion is "It is my belief that this man is disabled, I would say, a possible 25%. I cannot say that it is due to the accident from studies made thus far."
Other physicians, namely, Dr. Moss M. Bannerman, Dr. Lawrence J. Kern and Dr. Charles McVea examined plaintiff herein. They were not called by the plaintiff and on the attempt of counsel for defendant to call these physicians plaintiff's counsel objected on the ground of professional privilege. The objection was sustained. There is no basis for sustaining of this objection in a compensation case.
Presumably, these physicians would have testified adversely to the claims of plaintiff as we see no other reasons why plaintiff *Page 145 
would not permit them to testify. It is a fact that the report of Dr. Bannerman is in the record, but it is an ex parte statement to which timely objection was made to its filing and correctly sustained. It cannot be considered.
The fact remains that the trial judge based his opinion principally on the testimony of the doctors whom he appointed to examine plaintiff, namely, Dr. McHugh and Dr. Robbins. As set forth above, Dr. McHugh found that the plaintiff had a dissability of 15% or 20% and Dr. Robbins found that he had a disability of 25%. Neither one of these doctors connected the disability with the accident, but, on the other hand, they failed to attribute the disability to any other cause, and the trial judge apparently gave the plaintiff-employee the benefit of the doubt. We can see no manifest error in his having done so. The gist of the testimony of Dr. Moore, the Osteopath, and of Dr. Thom, both of whom treated plaintiff, is to the effect that his disability is the result of his accidental injury. Dr. Godfrey, the Company physician, apparently believes that he is a "malingerer", as did Dr. Kahle and Dr. Brostrom, but these experts merely point to possibilities, and not to anything certain, in attempting to establish the malingering of plaintiff.
In the present case the issue seems to be strictly whether the injury sustained by the plaintiff has affected his capacity to work as a common laborer, the work he was doing at the time when he was injured, or to work at his trade in the cleaning and pressing business. We do not find any reason to disagree with the trial judge's conclusion that the plaintiff had a partial disability. Plaintiff is therefore entitled to recover under paragraph (c) Subsection 1 of Section 8 of Act No. 20 of 1914, as amended Act No. 242 of 1928, p. 357. That paragraph provides for compensation for an injury producing partial disability to do work of a reasonable character at sixty-five per cent. of the difference between the wages at the time of injury and wages which the injured employee is able to earn thereafter during the disability, not beyond three hundred weeks. As set forth hereinabove, in the discussion of the issues, and as brought out by the testimony of L. E. Sandretta, who was in charge of the office of the defendant company, the plaintiff earned 55¢ an hour for 40 hours a week, plus time and a half for overtime and according to his contract of employment at the time of his injury, he was working a minimum of 56 hours a week, so that his weekly wage was 55¢ for 40 hours, or $22, and 82.5 cents for 16 hours, or $13.20, making a total of $35.20 per week, which appears to be his correct weekly salary. Under plaintiff's testimony, he made as much as $25 a week thereafter in his chosen trade or occupation. This makes a difference of $10.20 between the wages he was receiving at the time of injury and the wages he was able to earn thereafter, and 65% of which is the sum of $6.63. The judgment appealed from will be amended so as to allow plaintiff compensation to that amount.
The plaintiff contends that the district court erred in not granting an expert fee to Dr. Coyt Moore. In his reasons for judgment, after allowing the bill of Dr. Moore in the amount of $189, the trial judge states: "I do not think however that in addition to this sum Dr. Moore should receive expert witness fee, as his testimony consisted largely of his treatment and diagnosis of plaintiff's condition." We find no error in his ruling.
Plaintiff also complains of the disallowance of a claim for $22 representing the amount charged by Francis Julius, photographer, for taking pictures of plaintiff's shoulder, and also the failure to grant an expert fee to the said Francis Julius. The trial judge was of the opinion that the charges were not a legitimate item of costs. We are in accord with the trial judge's ruling.
Plaintiff also complains of the disallowance of his expenses in going to and from New Orleans. The trial judge found that the proof was insufficient to sustain an allowance. In his brief, plaintiff claims that an allowance of $10 per trip is a reasonable one. The record is barren of any proof that plaintiff expended such an *Page 146 
amount for bus or railroad fare, meals or other expenses. The trial judge was correct in his ruling.
For these reasons assigned, the judgment appealed from is hereby amended by increasing the rate of compensation from $4 per week to $6.63 per week and as thus amended the judgment is affirmed.